UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

WEST VIRGINIA HIGHLANDS
CONSERVANCY, INC. and
WEST VIRGINIA RIVERS
COALITION, INC.,

       Plaintiffs,

v.                                        Civil Action No. 2:07-0410

RANDY C. HUFFMAN,
Secretary, West Virginia
Department of Environmental
Protection,

       Defendant.

<u>MEMORANDUM OPINION AND ORDER</u>

Pending is the motion of the plaintiffs for summary judgment and declaratory and injunctive relief, filed March 12, 2008.  For the reasons that follow, the motion is granted.

I.

Surface coal mining operations in West Virginia can be said to fall in one of three categories: (1) abandoned mine lands which completed operations prior to the passage of the Surface Mining Control and Reclamation Act of 1977 ("SMCRA"), 30 U.S.C. §§ 1201 through 1328; (2) active or completed operations, which

were started or bond released since SMCRA's passage; and (3) bond forfeiture sites, where the permits of the mining companies have been revoked and bonds forfeited by the West Virginia Department of Environmental Protection ("WVDEP").  (WV AMD Study at 1, attached as Ex. 1 to M.S.J.).  This case is a citizen suit brought under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 through 1387, concerned with the discharge of acid mine drainage ("AMD") at sites in the third category, bond forfeitures.  (Mem. in Supp. of M.S.J. at 2).

First to be determined here is whether the WVDEP is acting in contravention of the CWA by discharging pollutants without the appropriate permit.  If the WVDEP is indeed in violation of the CWA, it must next be determined whether the Eleventh Amendment bars this action against defendant Randy C. Huffman, Secretary of the WVDEP ("Secretary").  If the former query is answered in the affirmative, and the latter in the negative, plaintiffs are entitled to judgment in their favor.

2

II.


The WVDEP revoked one surface mining permit of Harvey Energy Corp. in Fayette County, three surface mining permits of Royal Scott Minerals Inc. in Greenbrier County, and five surface mining permits of Triple A Coals, Inc. in Nicholas County and it forfeited the bonds posted by the three mine operators for those sites, all of which are located in the Southern District of West Virginia.[1]  (Stip. ¶ 1 and Table A, attached as Ex. 4 to M.S.J.). The WVDEP, as the operator of the treatment systems for the bond forfeiture sites, treats discharges of water at each of those sites and monitors for "pollutants," as defined in 33 U.S.C. § 1362(6).  (Id. ¶¶ 2,5).

Prior to the bond forfeitures, WVDEP issued a West

_____

[1] A parallel action styled West Virginia Highlands Conservancy, Inc. and West Virginia Rivers Coalition v. Randy Huffman, Secretary, West Virginia Department of Environmental Protection, Civil Action No. 07-cv-87, was filed in the Northern District of West Virginia on June 29, 2007.  The action involves eighteen bond forfeiture sites located in the Northern District of West Virginia that are similarly alleged to be in violation of the CWA.  By order dated January 14, 2009, the court granted plaintiffs' motion for summary judgment, declared the WVDEP to be in violation of the CWA and ordered the WVDEP to apply for and obtain permits for all sites in issue.  See West Virginia Highlands Conservancy, Inc., et al. v. Huffman, 588 F. Supp. 2d 678 (N.D. W. Va. 2009).  On March 26, 2009, final judgment was entered in the case.

3

Virginia National Pollutant Discharge Elimination System ("WV/NPDES") permit under the CWA, 33 U.S.C. § 1342, to the three mine operators for discharges at each site. (Id. ¶ 6). The WVDEP, however, does not currently have a WV/NPDES permit for discharges at any of the sites. (Id. ¶ 7).

The WVDEP has issued hundreds of NPDES permits for discharges from active mining sites. (WV AMD Study at 2, attached as Ex. 1 to M.S.J.). Only one NPDES permit, however, has been issued by the WVDEP to itself for discharges from a bond forfeiture site. That site was formerly controlled by the DLM Coal Co., and the permit was issued as a consequence of litigation. (WV/NPDES Permit No. WV0042056, attached as Ex. 2 to M.S.J.; Ellison Depo. at 113-114, attached as Ex. 3 to M.S.J.).

The WVDEP's obtainment of a permit has important consequences. "Generally speaking, the NPDES requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters." Piney Run Preservation Ass'n v. County Commissioners of Carroll County, Maryland, 523 F.3d 453, 456 (4th Cir. 2008) ("Piney Run II") (quoting S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians, 541 U.S. 95, 102 (2004)). "An NPDES permit 'defines, and facilitates compliance with, and enforcement of, a

4

preponderance of a discharger's obligations under the' [CWA]."

Id. (quoting EPA v. California ex rel. State Water Res. Control

Bd., 426 U.S. 200, 205 (1976)).  Importantly here, limits set

forth in an NPDES permit must be based on the best practicable

pollution control technology, plus any limitations needed to meet

state water quality standards.  See 33 U.S.C. § 1311(b)(1)(A) and

(C); 40 C.F.R. § 122.44(a)(1) and (d)(1).  Explaining the

difference between the standards, the Supreme Court stated:

> the Act provides for two sets of water quality
> measures.  "Effluent limitations" are promulgated by
> the EPA ["Environmental Protection Agency"] and
> restrict the quantities, rates, and concentrations of
> specified substances which are discharged from point
> sources.  See §§ 1311, 1314. "[W]ater quality
> standards" are, in general, promulgated by the States
> and establish the desired condition of a waterway.  See
> § 1313.  These standards supplement effluent
> limitations "so that numerous point sources, despite
> individual compliance with effluent limitations, may be
> further regulated to prevent water quality from falling
> below acceptable levels."  EPA v. California ex rel.
> State Water Resources Control Bd., 426 U.S. 200, 205,
> n. 12, 96 S.Ct. 2022, 2025, n. 12, 48 L.Ed.2d 578
> (1976).

Arkansas v. Oklahoma, 503 U.S. 91, 101 (1992).  Ken Ellison

("Ellison"), the designated WVDEP representative and Director of

the Division of Land Restoration of the WVDEP, has indicated the

WVDEP's position to be that it did "not take on the permittee's

compliance duties."  (Ellison Depo. at 48, attached as Ex. 3 to

M.S.J.).  Currently, WVDEP is only treating discharges from the

three sites to technology-based standards, not the more stringent water-quality based standards.  (Id. at 28-32, 51-52; Mem. in Supp. M.S.J. at 4).

### III.

Plaintiffs' claim is that of a CWA citizen bringing suit pursuant to 33 U.S.C. § 1365 for violation of 33 U.S.C. § 1311(a), which prohibits the discharge of pollutants in a manner that is inconsistent with 33 U.S.C. § 1342, or, in other words, without a NPDES permit.[2]  (Compl. ¶¶ 10-11).  The plaintiffs' motion for summary judgment requests that the court declare the Secretary to be in violation of the CWA and order him to apply for and obtain WV/NPDES permits within six months of the date of this order, provide monthly status reports to plaintiffs until the permits are obtained, and notify plaintiffs and the court when the permits are obtained.  (M.S.J.).  Plaintiffs also seek an award of costs and fees.  (Compl. at 5).

---

[2] "State court review is unavailable as the West Virginia Water Pollution Control Act -- the state version of the federal CWA -- does not have a citizen suit provision. W. Va. Code § 22-11-1 et seq."  Ohio Valley Environmental Coalition, Inc. v. Apogee Coal Co., LLC, 531 F. Supp.2d 747, 755 (S.D. W. Va. 2008).

On May 16, 2008, plaintiffs and the Secretary filed a joint motion to amend the scheduling order in which they stated that, "[t]he parties agree that there are no contested fact issues to be tried in this case, and that the contested legal issues may be decided on the briefs, stipulation, and exhibits filed by the parties concerning Plaintiffs' pending motion for summary judgment."  (Jt. Mot. to Am. Sched. Order at 1). Earlier, however, in his April 14, 2008 response to the pending motion for summary judgment, the Secretary stated that there were genuine issues of material fact. (Resp. to M.S.J. at 5).  The Secretary did not, however, cite any issues of fact specifically and attached only one exhibit to his response which did not create a factual dispute.  Instead, the Secretary's response focused entirely on issues of law.  Accordingly, the court accepts the joint assertion of the parties that there are no contested issues of fact.  A party is, of course, entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

IV.

"Congress enacted the CWA 'to restore and maintain the
chemical, physical, and biological integrity of the Nation's
waters.'"  Piney Run II, 523 F.3d at 455 (quoting 33 U.S.C. §
1251).  The CWA contains a general prohibition on the "discharge
of any pollutant," except in compliance with a state or federal
version of the NPDES permit program.  33 U.S.C. §§ 1311(a), 1342;
Piney Run II, 523 F.3d at 455 (quoting Miccosukee Tribe, 541 U.S.
at 102); Kentuckians for Commonwealth Inc. v. Rivenburgh, 317
F.3d 425, 447 (4th Cir. 2003).  It is well recognized that "[t]he
centerpiece of the CWA is the NPDES permitting program."  Am.
Iron & Steel Inst. v. EPA, 115 F.3d 979, 990 (D.C. Cir. 1990);
Dubois v. United States Dep't of Agric., 102 F.3d 1272, 1294 (1st
Cir. 1996) ("The most important component of the . . . [CWA] is
the requirement that an NPDES permit be obtained.").  Section 402
of the CWA, "establishes the NPDES permitting regime, and
describes two types of permitting systems: state permit programs
that must satisfy federal requirements and be approved by the
EPA, and a federal program administered by the EPA."  Arkansas,
503 U.S. at 102; see 33 U.S.C. § 1342.  The EPA granted West
Virginia the authority to administer its own NPDES program, and
permits in West Virginia are issued by the WVDEP.  Ohio Valley

8

<u>Environmental Coalition, Inc. v. Apogee Coal Co., LLC</u>, 531 F. Supp.2d 747, 753 (S.D. W. Va. 2008) (citing W. Va. Code § 22-11-4(a)(1); 47 C.S.R. § 10.3 (2005)).

The CWA citizen suit provision affords "any citizen" the right to "commence a civil action on his own behalf -- (1) against any person (including (i) the United States and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter . . . ."[3]  33 U.S.C. § 1365.

Under this statutory framework, courts have found citizens to possess a cause of action under § 1365 to stop the discharge of pollutants without a permit.  <u>See</u>, <u>e.g.</u>, <u>U.S. Pub. Interest Research Group v. Atl. Salmon of Me., LLC</u>, 339 F.3d 23, 27 (1st Cir. 2003); <u>Association to Protect Hammersley, Eld and</u>

---

[3] In a recent decision, our court of appeals explained that the citizen suit provision is a "second level of enforcement" meant to supplement the "primary responsibility" vested in the state and federal governments.  <u>Piney Run II</u>, 523 F.3d at 456 (internal citations omitted).  Citizen suits "serve as a check to ensure the state and federal governments are diligent in prosecuting Clean Water Act violations."  <u>Id.</u>  The court noted that the "citizen suit provision is 'critical' to the enforcement of the CWA . . . as it allows citizens 'to abate pollution when the government cannot or will not command compliance . . . .'"  <u>Id.</u> (internal citations omitted).

<u>Totten Inlets v. Taylor Resources, Inc.</u>, 299 F.3d 1007, 1012 (9th
Cir. 2002); <u>Sierra Club v. Cedar Point Oil</u>, 73 F.3d 546, 561 (5th
Cir. 1996).  A state "has no authority to create a permit
exemption from the CWA for discharges that would otherwise be
subject to the NPDES permitting process."  <u>Northern Plains
Resource Council v. Fidelity Exploration and Development Co.</u>, 325
F.3d 1155, 1164 (9th Cir. 2003) (citing 33 U.S.C. § 1370).

       To establish liability for a violation of the CWA NPDES
permit requirement, plaintiffs must show that the Secretary (1)
discharged or added (2) a pollutant (3) to waters of the United
States (4) from a point source (5) without a permit.[4]  <u>See</u> 33
U.S.C. §§ 1311(a), 1342, 1362(12); <u>Committee to Save the
Mokelumne River v. East Bay Municipal Utility Dist.</u>, 13 F.3d 305,
308 (9th Cir. 1993), <u>cert. denied</u> 115 S.Ct. 198 (1994); <u>National
Wildlife Fed'n v. Gorsuch</u>, 693 F.2d 156, 165 (D.C. Cir. 1982).

       The stipulation of the parties, attached to the motion
for summary judgment, provides, in relevant part, as follows:

---

       [4] Plaintiffs spend considerable time in their memorandum
explaining how they have satisfied the requirements for standing.
The Secretary makes no argument or reference to standing in his
response.  Having reviewed the plaintiffs' memorandum and
exhibits attached to the motion, the standing requirements are
satisfied.

2.   At each of the sites . . . WVDEP has operated, and
     is continuing to operate, a treatment system to
     treat discharges of water from the site.

3.   At each of the sites . . . the water from the
     treatment system is discharged from the outfall(s)
     . . . .

4.   At each of the sites . . . the water discharged
     from the discharge points enters the receiving
     stream . . . which is a part of the larger river
     watershed . . . . Each of these receiving streams
     is a water of the United States as defined at 33
     U.S.C. § 1362(7).

5.   At each of the sites . . ., the water discharged
     from the discharge points has been monitored by
     WVDEP for pollutants  . . . as defined at 33
     U.S.C. § 1362(6).

6.   Prior to bond forfeiture, WVDEP issued a WV/NPDES
     permit under the Clean Water Act, 33 U.S.C. §
     1342, to the mine operator for discharges of water
     from each of the sites and discharge points . . .
     .

7.   WVDEP does not have a WV/NPDES permit for
     discharges from any of the [relevant] sites and
     discharge points . . . .

(Stip. ¶¶ 2-7, attached as Ex. 4 to M.S.J.).  With this

stipulation, the third element, "waters of the United States,"

(id. ¶ 4), and fifth element, "without a permit," (id. ¶ 7), are

plainly satisfied.

        The Secretary's response to the plaintiffs' motion for

summary judgment "admits [that the] WVDEP manages and controls

the release of AMD [acid mine drainage] on these sites." (Resp.

to M.S.J. at 9).  Inasmuch as AMD is obviously a pollutant under
the definition of "pollution" in 33 U.S.C. § 1362(19), <u>see</u>, <u>e.g.</u>,
<u>Mokelumne</u>, 13 F.3d at 308, the second element is fulfilled.
Further, making it abundantly clear that the second element,
"pollutant," has been satisfied, Ellison testified, in reference
to the sites at issue, that the WVDEP "treat[s] pollutional
discharges.  We are going there to treat an existing pollution
problem."  (Ellison Depo. at 50, attached as Ex. 3 to M.S.J.).

        With respect to the first element, "discharged or
added," the court reiterates the Secretary's admission that AMD
is being released at the sites.  (Resp. to M.S.J. at 9).  It is
thus indisputable that discharge of pollutants is occurring.  The
question of causation that remains with respect to this element
is whether the discharge is "by" the WVDEP, as required by §
1311(a).

        It is generally recognized that liability under the CWA
is a form of strict liability.  <u>Stoddard v. Western Carolina
Regional Sewer Auth.</u>, 784 F.2d 1200, 1208 (4th Cir. 1986) (citing
<u>United States v. Earth Sciences, Inc.</u>, 599 F.2d 368 (10th Cir.
1979); <u>United States v. Amoco Oil Co.</u>, 580 F. Supp. 1042 (W.D.
Mo. 1984)); <u>accord</u> <u>American Canoe Ass'n v. Murphy Farms</u>, 412 F.3d

536, 540 (4th Cir. 2005) (citing <u>Stoddard</u>).  "The regulatory
provisions of the FWPCA [Federal Water Pollution Control Act, a
1972 amendment to the CWA] were written without regard to
intentionality, . . . making the person responsible for the
discharge of any pollutant strictly liable."  <u>U.S. v. Earth
Sciences, Inc.</u>, 599 F.2d 368, 374 (10th Cir. 1979).  "Nothing in
the Act relieves" defendants "from liability simply because the
operators did not actually construct those conveyances, so long
as they are reasonably likely to be the means by which pollutants
are ultimately deposited into a navigable body of water."  <u>Sierra
Club v. Abston Const. Co., Inc.</u>, 620 F.2d 41, 45 (5th Cir. 1980).

        The Secretary argues that the WVDEP is not the owner of
the property upon which the sites are located and has not reaped
any benefit from its use thereof, and thus does not stand in the
shoes of the former permittees. (Resp. to M.S.J. at 5, 9).  In
his deposition, Ellison confirmed what the Secretary later said
in his response -- that the WVDEP controls the discharge of AMD
at the sites. (<u>Id.</u> at 9; Ellison Depo. at 49, attached as Ex. 3
to M.S.J.).  The stipulation indicates that the WVDEP operates
the treatment system of discharges of water at the sites. (Stip.
¶ 2, attached as Ex. 4 to M.S.J.).

13

"The causation requirement can be met because of a defendant's control over discharges."  Comm. to Save the Mokelumne River v. East Bay Mun. Util. Dist., 37 Env't Rep. Cas. (BNA) 1159, 1170 (E.D. Cal. 1993) (citing Friends of the Sakonnet v. Dutra, 738 F. Supp. 623, (D. R.I. 1990), *aff'd* 13 F.3d 305 (9th Cir. 1993)).  As the Secretary admittedly exercises control over the bond forfeiture sites, and is now responsible for the discharges occurring there, the causation requirement is met. (Resp. to M.S.J. at 9).  Accordingly, the first element, "discharged or added," is satisfied.[5]  See Murphy Farms III, 412 F.3d at 540; Stoddard, 784 F.2d at 1208; Abston, 620 F.2d at 45; Earth Sciences, 599 F.2d at 374.

The fourth element, "from a point source," requires a return to the text of the CWA.  A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, [or] discrete fissure . . . from which pollutants are or may be

---

[5] Further support for this position is found in the federal and state rules that require the operator, rather than the owner of the property, to obtain the NPDES permit.  40 CFR § 122.21(b) ("When a facility or activity is owned by one person but is operated by another person, it is the operator's duty to obtain a permit."); 47 CSR § 10-4.1.b ("When a facility or activity is owned by one (1) person but is operated by another, the application should be submitted by the operator.").

discharged." See 33 U.S.C. § 1362(14).  The EPA has stated its intent "to embrace the broadest possible definition of point source consistent with the legislative intent of the CWA." See 55 Fed. Reg. 47990, 47997 (Nov. 16, 1990).  The WVDEP has stipulated that the water from the treatment system is discharged through outfalls.  (Stip. ¶ 3, attached as Ex. 4 to M.S.J.).  Ellison admitted that each outfall has the physical characteristics of a point source.  (Ellison Depo. at 23, attached as Ex. 3 to M.S.J.).  The WVDEP's photographs show that each outfall is a pipe, which is expressly mentioned in the non-exhaustive list in the definition of a point source.  (Id. at 63-67; Discharge Point Photographs, attached as Exs. 12-13 to M.S.J.).  Ellison further acknowledged that if the outfalls were operated by a private company, they would require a NPDES permit.  (Ellison Depo. at 20, 23, attached as Ex. 3 to M.S.J.).

The Secretary argues that the EPA and the Office of Surface Mining of the Secretary of the Interior ("OSM") do not consider AMD at bond forfeiture sites to be from point sources.  (Resp. to M.S.J. at 10-16).  According to the Secretary, the EPA considers abandoned mine lands and bond forfeiture sites to be "unpermitted discharge sites . . . and categorized them accordingly" in its Total Maximum Daily Load ("TMDL") allocation,

15

which the Secretary describes as a plan of action used to clean up streams not meeting water quality standards.  (Id. at 10-11). The Secretary further argues that, for many years, the EPA has been aware of the WVDEP's position that bond forfeiture sites do not require a NPDES permit, and has tacitly approved of the State's level of water treatment under the TMDL approach.  (Id. at 11-12).  The approval of the EPA is also displayed, the Secretary asserts, in a 2001 correspondence from the Pennsylvania Department of Environmental Protection ("PADEP") advising the EPA of its plan to treat abandoned mine land and bond forfeiture sites in a comprehensive manner using the TMDL approach, rather than under the NPDES permitting regime.  (Id. at 12; 08-20-01 PADEP Ltr. to EPA, attached as Ex. to Resp. to M.S.J.).

Plaintiffs point out, and the Secretary acknowledges, however, that the EPA has not determined that discharges from bond forfeiture sites are exempt from NPDES permitting requirements.  (Reply to Resp. to M.S.J. at 9; Resp. to M.S.J. at 12).  To underscore their point, plaintiffs quote the following excerpt from EPA's response to the PADEP:

> We also wish to call your attention to a statement in your letter which does not accurately characterize EPA's view.  You indicated that it is EPA's view that "discharges of mine drainage from abandoned mine lands constitute non-point source pollution best handled

16

using a TMDL-based approach."  We acknowledge that some
acid mine drainage TMDLs address abandoned and
reclaimed mine lands as non-point sources for modeling
purposes.  This is because there are no current
National Pollutant Discharge Elimination System (NPDES)
permits associated with these areas.  As such, the
discharges associated with these land uses were
assigned load allocations.  In each instance, EPA has
noted that the decision to assign load allocations to
abandoned and reclaimed mine lands <u>does not reflect any
determination by EPA as to whether there are
unpermitted point source discharges within these land
uses.  Nor does it reflect a determination by EPA that
these discharges are exempt from NPDES permitting
requirements</u>.

(11-07-01 EPA Ltr. to PADEP, attached as Ex. to Resp. to M.S.J.)

(emphasis added).  The underlined portion of the response of the

EPA nullifies the Secretary's argument that the EPA has decided

that discharges from bond forfeiture sites cannot be deemed to be

from point sources.

The EPA is the federal agency responsible for

administering portions of the CWA.  <u>See</u> 33 U.S.C. § 1251, <u>et</u> <u>seq.</u>

Under SMCRA, in certain circumstances the OSM is responsible for

aspects of surface mining reclamation.  <u>See</u> 30 U.S.C. § 1252, <u>et</u>

<u>seq.</u>  SMCRA mandates that the OSM have exclusive regulatory

authority over the surface mining reclamation programs of states

that have not passed adequate laws governing surface coal mining

reclamation.  <u>Id.</u> § 1254.  Unlike West Virginia, in Tennessee the

OSM has assumed such regulatory authority.  <u>See</u> 72 Fed. Reg. 9616

(Mar. 2, 2007).  It is of interest to observe how the OSM
perceived its role in Tennessee.  In the federal register the OSM
indicated that, because in its regulatory capacity the OSM does
"not assume the permittee's NPDES compliance duties," it did not
intend to seek NPDES permits at bond forfeiture sites.  Id. at
9629.

       As plaintiffs point out, the OSM's statement in the
federal register only considered the extent of its responsibility
under SMCRA, and the rules implementing SMCRA.  Id.  OSM did not
purport to address a state's authority or, for that matter, the
EPA's authority under the CWA.  Indeed, the OSM acknowledged,
"[i]ssuance of a National Pollutant Discharge Elimination System
(NPDES) permit for point-source discharges and establishment of
effluent limits for those discharges is the responsibility of the
agency charged with administering the CWA in Tennessee."  Id. at
9627.  The OSM's statements, therefore, do not constitute an
agency interpretation that bond forfeiture sites are exempt from
the NPDES permitting requirements of the CWA.

        In the absence of a NPDES permit, "the discharge of
any pollutant by any person shall be unlawful."  § 1311(a); see
Citizens Coal Counsel v. EPA, 447 F.3d 879, 919 (6th Cir. 2006)

18

(citing § 1311(a) and stating "nobody may pollute without a NPDES permit."); <u>Sierra Club v. El Paso Gold Mines, Inc.</u>, 421 F.3d 1133, 1142 (10th Cir. 2005) ("Section 301(a) of the CWA states that 'the discharge of any pollutant by any person shall be unlawful,' unless authorized by an NPDES permit.")  The CWA defines "person" as "an individual, corporation, partnership, association, <u>state</u>, municipality, commission or political subdivision of a state, or any interstate body."  § 1362(5) (emphasis added).  Thus, the text of the CWA supports plaintiffs' position that bond forfeiture sites operated by the state are subject to CWA permitting requirements.

While the EPA "does not have authority to exempt categories of point sources from the permit requirements of" the CWA, <u>Natural Resources Defense Council, Inc. v. Costle</u>, 568 F.2d 1368, 1377 (D.C. Cir. 1977), the regulations established by the EPA to effectuate the NPDES permitting system provide further support for the plaintiffs' position.  Under those regulations, "[a]ny person who discharges or proposes to discharge pollutants . . . and who does not have an effective permit . . . must submit a complete application to the Director in accordance with this section."  40 C.F.R. § 122.21(a).  Similar to the text of the CWA, 40 C.F.R. § 122.2 defines "person" as "an individual,

19

association, partnership, corporation, municipality, State or
Federal agency, or an agent or employee thereof."  Titled, "Who
applies," 40 C.F.R. § 122.21(b) provides "[w]hen a facility or
activity is owned by one person but is operated by another
person, it is the operator's duty to obtain a permit."  "Owner or
operator means the owner or operator of any 'facility of
activity' subject to regulation under the NPDES program."  40
C.F.R. § 122.2.  Facility or activity "means any NPDES 'point
source' or any other facility or activity (including land or
appurtenances thereto) that is subject to regulation under the
NPDES program."  Id.  As noted, the secretary admits that the
WVDEP "manages and controls the release of AMD" at the sites in
question.  (Resp. to M.S.J. at 9).  "When an operator applies for
a NPDES permit, the following information must be provided:
"operator's name, address, telephone number, ownership status,
and status as Federal, State, private, public, or other entity."
40 C.F.R. § 122.21(f)(4).

        The outfalls at issue here have the physical
characteristics of a point source.  (Ellison Depo. at 23,
attached as Ex. 3 to M.S.J.).  The Secretary's sole basis for
denying that the outfalls are point sources is his contention
that the EPA does not treat bond forfeiture sites that discharge

AMD as point sources.   (Resp. to M.S.J. at 10).  As shown above,
the EPA has not taken such a position.  The text of the CWA
clearly provides that, as a "person" under the Act, a state shall
not discharge pollutants without a permit.  The regulations
promulgated in accordance with the CWA are in accord.  Nothing in
the text of the CWA, or the regulations, leads the court to
believe that a "discernable, confined and discrete conveyance,
including but not limited to any pipe, ditch, channel, tunnel,
conduit, well [or] discrete fissure . . . from which pollutants
are or may be discharged," 28 U.S.C. §1362(14), is not a point
source simply because it is managed and controlled by the state.
As noted by the court in <u>Piney Run Preservation Ass'n v. County
Com'rs of Carroll County</u>, 268 F.3d 255, 265 (4th Cir. 2001)
("<u>Piney Run I</u>"), "Congress intended the NPDES permit to be the
only means by which a discharger from a point source may escape
the total prohibition of § [1311(a)]."  The WVDEP is such a
"discharger," and the plaintiffs have established the five
elements of a successful claim under the CWA for the discharge of
pollutants without an NPDES permit.[6]

_____

    [6]  Another of the Secretary's arguments is that obtaining
NPDES permits would be inconsistent with WVDEP's duties under
state law to prioritize treatment methods based on a cost-benefit
analysis, 38 CSR 12.5.c.-d., and impose treatment costs on the
mine operator, 38 CSR 2-12.4.e.  Inasmuch as (1) the state
standards are not inconsistent with and are not a basis for

V.

A.

The Eleventh Amendment "bars 'citizens from bringing
suits in federal court against their own states.'" Bragg v. West
Virginia Coal Ass'n, 248 F.3d 275, 291 (4th Cir. 2001) (internal
citations omitted).[7] The Amendement further acts as a bar where,
as here, the suit is against a state official but the State is
the real party in interest. Id. Eleventh Amendment immunity is
"an essential element of the constitutional design" inasmuch as
it "accords the States the respect owed them as members of the

_____

violating federal law, irrespective of their inconsistency; (2) a
state may not create an exception to the permit requirement, see
Northern Plains, 325 F.3d at 1164; (3) West Virginia mining
regulations require "that all applicable effluent and applicable
water quality standards are met" at bond forfeiture sites, 38 CSR
§2-2.37; and (4) the Supreme Court of Appeals of West Virginia
has held that W. Va. Code § 22-3-11(g) imposes on WVDEP "a
mandatory, nondiscretionary duty to utilize moneys from the SRF
[Special Reclamation Fund] . . . to treat AMD at bond forfeiture
sites when the proceeds of the forfeited bonds are less than the
actual cost of reclamation[,]" State ex rel. West Virginia
Highlands Conservancy v. WVDEP, 191 W. Va. 179, 184, 447 S.E.2d
920, 925 (1994), the court rejects the Secretary's argument and
finds a more detailed discussion to be unnecessary.

[7] U.S. CONST. amend. XI provides: The Judicial power of the
United States shall not be construed to extend to any suit in law
or equity, commenced or prosecuted against one of the United
States by Citizens of another State, or by Citizens or Subjects
of any Foreign State.

22

federation" and "protects the States' ability to govern in accordance with the will of their citizens."  Id. (internal citations omitted).

As noted by our court of appeals, Eleventh Amendment immunity is not absolute: "A State's immunity to suit in federal court is subject to well established and important exceptions." Id. (citing S.C. State Ports Auth. v. Fed. Maritime Comm'n, 243 F.3d 165 (4th Cir. 2001)) (enumerating six exceptions to Eleventh Amendment immunity).  The exception at issue here is that private individuals or entities are not precluded from suing state officials for prospective injunctive or declaratory relief designed to remedy ongoing violations of federal law.  See Ex parte Young, 209 U.S. 123, 157 (1908).  The rationale for the so-called "Ex parte Young exception" is the notion that when a state officer violates federal law, he is stripped of his official character, and thereby loses the cloak of state immunity.  See id. at 159-60; Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 281 (1997); Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 102 (1984); Bragg, 248 F.3d at 292.

Citing Bragg, the Secretary argues that he is immune from suit under the Eleventh Amendment.  He says that "[b]ecause

23

the State of West Virginia has an approved NPDES permitting
program and is therefore the primary regulator with respect to
the issuance of NPDES permits in West Virginia, this lawsuit is
ultimately an attempt to force Secretary Huffman to comply with
state laws and regulations relating to the issuance of an NPDES
permit." (Resp. to M.S.J. at 6). In Bragg, which arose under
SMCRA, an important issue was whether the violation in question
was a matter of federal law, and thus fell under the Ex parte
Young exception to Eleventh Amendment immunity, or whether the
SMCRA violation implicated state law and was within the confines
of Eleventh Amendment immunity under Pennhurst, 465 U.S. at 106.
It is Pennhurst that held the Ex parte Young exception not to
apply to state-law claims.[8]  See Bragg, 248 F.3d at 289-295.

In Bragg, West Virginia state officials were sued under
SMCRA, which allows states to enact their own surface mining
reclamation laws and submit them to the Secretary of the Interior
for review.  See Antrican v. Odom, 290 F.3d 178, 187 (4th Cir.
2002).  Once the Secretary of the Interior approves a state

_____

[8] The Secretary has not made an argument that the limitations
on the Ex parte Young exception described in Couer d'Alene, 521
U.S. at 282-283; Seminole Tribe of Fla. v. Florida, 517 U.S. 44,
74 (1996); and Edelman v. Jordan, 415 U.S. 651, 664-667 (1974),
are applicable.

24

mining reclamation program, the state has achieved "primacy" status in the SMCRA regime.  See Ohio River Valley Environmental Coalition, Inc. v. Kempthorne, 473 F.3d 94, 97 (4th Cir. 2006) (citing Bragg, 248 F.3d at 289).

Primacy status under SMCRA affords the state "exclusive jurisdiction to regulate surface coal mining within its borders." 30 U.S.C. §§ 1252(e), 1253(a); Bragg, 248 F.3d at 288-289.  The "exclusive control over the regulation of surface mining," exists "so long as the State law fulfills minimum national standards." Antrican, 290 F.3d at 187 (citing Bragg, 248 F.3d at 293-94).

Under the SMCRA-created framework, some federal law provisions, including those at issue in Bragg, "drop out" after the state law plan has been approved.  Id. at 289, 295. Conversely, when a state fails to submit a program for approval, the federal program is applicable and the Secretary of the Interior is vested with "exclusive jurisdiction" to regulate surface coal mining in the non-primacy state.  Id. at 289 (citing 30 U.S.C. § 1254(a)).  The mutual exclusivity of state and federal law in the SMCRA context was paramount in Bragg, 248 F.3d at 289, 293-295.

Although "[t]he federal requirements 'drop out' as

25

operative provisions" upon approval of a state mining reclamation program, "they 'continu[e] to provide the 'blueprint' against which to evaluate the State's program' and can be reengaged in a 30 U.S.C.A. § 1271 enforcement proceeding by the Secretary [of the Interior]." Kempthorne, 473 F.3d at 97 (quoting Bragg, 248 F.3d at 289). SMCRA "manifest[s] an ongoing federal interest in assuring that minimum national standards for surface coal mining are enforced . . . through a limited and ordered federal oversight, grounded in a process [as set forth in 30 U.S.C. § 1254(a), 1267, 1271] that can lead ultimately to the withdrawal of the State's exclusive control" if a state fails to abide by its plan. Bragg, 248 F.3d at 294 (citing 30 U.S.C. §§ 1271, 1267; In re Permanent Surface Mining Regulation Litig., 653 F.2d 514, 520 (D.C. Cir. 1981) (en banc)). Though not discussed in Bragg, SMCRA continues to preempt state laws and regulations that are inconsistent with federal standards, see 30 U.S.C. § 1255, and the OSM retains the right to enter and inspect mines to evaluate the state's administration of its program and may enforce part of a state's regulatory program if it finds the state to be doing an inadequate job. Id. §§ 1267(a), 1254(b). Nevertheless, with respect to surface coal mining, a SMCRA primacy state's regulatory power is exclusive in the sense that

26

the federal enforcement provisions drop out upon approval of the state program and largely remain unavailable as long as the State is in compliance with its own program.  See id. §§ 1252-55, 1267, 1270-71.

As such, "characterizing the regulatory structure of SMCRA as 'cooperative' federalism is not entirely accurate, as the statute does not provide for shared regulation of coal mining."  Bragg, 248 F.3d at 293.  Rather, SMCRA "provides for enforcement of either a federal program or a State program, but not both.  Thus, in contrast to other 'cooperative federalism' statutes, SMCRA exhibits extraordinary deference to the States."  Id.  The court of appeals explained that its conclusion in Bragg was,

> that in that context "any injunction against State officials to enforce this provision would command them to comport with the State's own law, not federal law, because only the State law [was] operative and directly regulate[d] the issuance of [mining] permits." [Bragg, 248 F.3d] at 296.  Therefore, in that context, the Ex Parte Young exception did not apply.

Antrican, 290 F.3d at 187.  Furthermore, ordering the State to comport with federal law would impermissibly end "exclusive State regulation and undermine the federalism established by [SMCRA]."  Bragg, 248 F.3d at 295.

27

B.

While the Secretary looks to <u>Bragg</u> in support of his
assertion of immunity, plaintiffs also find support in that
opinion. Plaintiffs point out, and the Secretary admits, that
there are differences between the CWA and SMCRA. (Mem. in Supp.
of M.S.J. at 2; Resp. to M.S.J. at 7). Noting these differences,
<u>Bragg</u> states:

> The statutory federalism of SMCRA is quite unlike the
> cooperative regime under the Clean Water Act, 33 U.S.C.
> § 1251 et seq., which was construed in <u>Arkansas v.</u>
> <u>Oklahoma</u>, 503 U.S. 91, 117 L. Ed. 2d 239, 112 S. Ct.
> 1046 (1992). As the Supreme Court noted there, one of
> the Clean Water Act's regulations "effectively
> incorporated" State law into the unitary federal
> enforcement scheme, making State law, in certain
> circumstances, federal law. <u>Id</u>. at 110 (emphasis
> added). Under SMCRA, in contrast, Congress designed a
> scheme of mutually exclusive regulation by either the
> U.S. Secretary of the Interior or the State regulatory
> authority, depending on whether the State elects to
> regulate itself or to submit to federal regulation.

<u>Bragg</u>, 248 F.3d at 294. This statement alone, however, does not
resolve the question of whether the Secretary is immune from suit
under the Eleventh Amendment.

As discussed more fully below, the statutory federalism
of the CWA is indeed quite different from that of SMCRA. The
Court in <u>Arkansas</u> discussed only a narrow aspect of the

28

interaction between state and federal law under the CWA.  In
Arkansas, the EPA issued an NPDES permit to the city of
Fayetteville, Arkansas for the operation of a sewage treatment
plant.  The water discharged from the plant made its way to the
Illinois river, which flows though Oklahoma.  Oklahoma challenged
the issuance of the permit, contending that it violated Oklahoma
water quality standards.  As an initial matter, the Court found
that the EPA acted within its discretion under the CWA in
enacting a regulation prohibiting the issuance of NPDES permits
if the conditions of the permit cannot ensure compliance with the
water quality standards of all affected states.  Id. at 107.  The
Court then held that the EPA did not err in issuing a permit to
Fayetteville.  Id. at 113-114.

When Arkansas was decided, the state of Arkansas had
not been authorized to issue NPDES permits, and the EPA was
therefore the entity responsible for administering the NPDES
permit program in Arkansas.  Further, and importantly, the
Court's discussion of the relationship between state and federal
law under the CWA was largely limited to its finding that the EPA
regulation requiring NPDES permits to comply with the water
quality standards of affected states "effectively incorporates
into federal law those state-law standards the Agency reasonably

determines to be applicable."  Id. at 110.  The Court offered the
following rationale for this conclusion:

> First, as discussed more thoroughly above, we have long
> recognized that interstate water pollution is
> controlled by federal law.  Recognizing that the system
> of federally approved state standards as applied in the
> interstate context constitutes federal law is wholly
> consistent with this principle. Second, treating state
> standards in interstate controversies as federal law
> accords with the Act's purpose of authorizing the EPA
> to create and manage a uniform system of interstate
> water pollution regulation.

Id. (internal citation omitted).


As noted in Bragg, Arkansas indeed stands for the
proposition that "in certain circumstances" the CWA incorporates
state into federal law.  Bragg, 248 F.3d at 294.  Yet, the
circumstances presented by this action are not synonymous with
those in Arkansas.  West Virginia has been authorized to
administer its own NPDES permit program, and this case does not
involve an interstate dispute.  Nor does this dispute involve a
question of the propriety of issuing a permit, but instead asks
whether obtainment of a permit by the WVDEP is necessary, and
whether such necessity springs from state or federal law.  While
the distinction in Bragg between the CWA and SMCRA is helpful as
a starting point, resort must be had to the text of the CWA and
other relevant authority to determine whether the requirement

30

that the WVDEP obtain a NPDES permit arises from state or federal
law.

C.

The court must first determine whether the CWA
contemplated the same exclusivity of regulation as SMCRA, as
interpreted by <u>Bragg</u>.  The CWA's delegation of administrative
responsibility for the NPDES permitting process to willing states
is similar, in some respects, to the delegation of responsibility
in SMCRA.  Upon federal approval of a state's program for the
regulation of surface coal mining, SMCRA's federal regulatory
provisions "drop out."  <u>Bragg</u>, 248 F.3d at 289, 295.  The
analogous portion of the CWA provides,

> (c) Suspension of Federal program upon submission of
> State program; withdrawal of approval of State program;
> return of State program to Administrator
>
> > (1) Not later than ninety days after the date on
> > which a State has submitted a program (or revision
> > thereof) pursuant to subsection (b) of this
> > section, the Administrator <u>shall suspend the
> > issuance of permits</u> under subsection (a) of this
> > section as to those discharges subject to such
> > program unless he determines that the State permit
> > program does not meet the requirements of
> > subsection (b) of this section or does not conform
> > to the guidelines issued under section 1314(i)(2)
> > of this title.  If the Administrator so
> > determines, he shall notify the State of any

31

> revisions or modifications necessary to conform to
> such requirements or guidelines.

33 U.S.C. § 1342(c)(1) (emphasis added).[9]  Federal approval of a state's water pollution permit program results in suspension of the CWA's federal permit program -- but <u>only</u> the permit program. <u>See</u> <u>id.</u>  Other provisions of the CWA remain.  <u>See</u> <u>id.</u>; <u>Washington Wilderness Coalition v. Hecla Mining Co.</u>, 870 F. Supp. 983, 987 (E.D. Wash. 1994) ("Section 1342(c), which suspends the federal permit program upon approval of a state program, simply guarantees that the state will be the sole entity issuing NPDES permits.").

In emphasizing "the unity of purpose behind state and federal CWA programs," courts have held "that citizens may enforce effluent limitations regardless of whether the EPA or a

_____

[9] In contrast to § 1342(c)(1) of the CWA, SMCRA provides:

Each State in which there are or may be conducted surface coal mining operations on non-Federal lands, and which wishes to assume <u>exclusive jurisdiction</u> over the regulation of surface coal mining and reclamation operations, except as provided in sections 1271 and 1273 of this title and subchapter IV of this chapter, shall submit to the Secretary, by the end of the eighteenth-month period beginning on August 3, 1977, a State program which demonstrates that such State has the capability of carrying out the provisions of this chapter . . . .

30 U.S.C. § 1253(a) (emphasis added).

state agency issues the NPDES permits." <u>Hecla Mining</u>, 870 F.
Supp. at 987 (citing <u>United States v. Hooker Chem. & Plastics</u>,
749 F.2d 968 (2d Cir. 1984); <u>Lutz v. Chromatex, Inc.</u>, 725 F.
Supp. 258, 261 (M.D. Pa. 1989); <u>McClellan Ecological Seepage
Situation ("MESS") v. Weinberger</u>, 707 F. Supp. 1182, 1190-91
(E.D. Cal. 1988)); <u>accord</u> <u>Williams Pipe Line Co. v. Bayer Corp.</u>,
964 F. Supp. 1300, 1317 (S.D. Iowa 1997); <u>Ohio Valley Envtl.
Coal., Inc. v. Hobet Mining, LLC</u>, No. 3:08-0088, 2008 U.S. Dist
LEXIS 10559, at *4 (S.D. W. Va. Dec. 18, 2008).  Admittedly, the
citizen suits in the <u>Hecla Mining</u> strand of cases are distinct
from this case inasmuch as, unlike those cases, the State is the
target of this suit, not merely a passive observer in the
process.  Despite the different contexts in which they arise,
<u>Hecla Mining</u> was nonetheless unwavering in its statement that,
"[n]othing in the language or structure of the CWA suggests that
citizens suits are incompatible with state administration of the
NPDES permit program."  870 F. Supp. at 987.  <u>Hecla Mining</u> went
on to express its belief that, "it would be bad policy to remove
a key component of private enforcement from the CWA simply
because the EPA has approved a state permit program in lieu of
the federal bureaucracy."  <u>Id.</u>; <u>see</u> <u>also</u> <u>Piney Run II</u>, 523 F.3d
at 456 ("We have recognized that this citizen suit provision is

33

critical to the enforcement of the CWA, as it allows citizens to abate pollution when the government cannot or will not command compliance.") (internal citation and quotation marks omitted).

The text of the CWA supports the view employed in <u>Hecla Mining</u> that CWA "citizens suits may proceed in states administering their own NPDES permit program." <u>Id.</u>  First, the definition of "effluent limitation" in § 1362(11) includes "any restriction established by a state or the [EPA] Administrator." Second, juxtaposition of the purpose section of the CWA, 33 U.S.C. § 1251(b), with 30 U.S.C. § 1253 of SMCRA, demonstrates the wisdom of the position taken in <u>Hecla Mining</u>.  The CWA provides, "[i]t is the policy of Congress to recognize, preserve, and protect the <u>primary</u> responsibilities and rights of States to prevent, reduce, and eliminate pollution. . . . [and] that the States . . . <u>implement the permit programs</u> under sections 1342 and 1344 . . . ." 33 U.S.C. § 1251(b) (emphasis added).  The congressional articulation of policy to vest the States with "primary" authority under the CWA is distinct, in a profoundly important way, from the "exclusive" authority vested in states under SMCRA.  <u>See</u> 30 U.S.C. § 1253(a).  As a consequence, upon EPA acceptance of a state's plan for administration of the NPDES permit program, neither federal nor state law completely "drop

out."

Importantly, the congressional preference for state implementation of permit programs under the CWA framework is narrower in scope than the exclusive regulation of all surface mining matters reserved for primacy states in the SMCRA regime. As pointed out in Hecla Mining, § 1342(c) of the CWA, "which suspends the federal permit program upon approval of a state program, simply guarantees that the state will be the sole entity issuing NPDES permits." 870 F. Supp. at 987. The statutory framework of the CWA stands in stark contrast to the relevant SMCRA provisions at issue in Bragg, which give states "exclusive regulatory control through enforcement of their own approved laws" because "Congress intended that the federal law establishing minimum national standards would 'drop out' as operative law and that the State laws would become the sole operative law." Bragg, 248 F.3d at 295.

The cooperative nature of the CWA model as recognized in Bragg, 248 F.3d at 294, and Arkansas, which specifically stated that the CWA "anticipates a partnership between the States and the Federal Government," 503 U.S. at 101, is in accord with the Hecla Mining position that federal CWA citizen suits are

35

viable regardless of whether a state has been granted the
authority to administer its own NPDES program.  The CWA does not
seek to attain the conditional exclusivity of regulation found in
Bragg to exists under SMCRA.  Based on the text of the CWA,
including its statement of congressional purpose, coupled with
the understanding in Arkansas and Bragg that the CWA generally
was intended to be a cooperative scheme between the states and
the federal government, and the rationale articulated in Hecla
Mining, the court finds the CWA's citizen suit provision remains
viable in the realm of remedying violations of CWA water quality
measures and the NPDES permit requirement.[10]

_____

[10] This is so despite the following passage from a 1977 House
Report cited by the Secretary:

> The Conference substitute provides for the
> administration by a state of its own permit program for
> the regulation of the discharge of dredged or fill
> material into the navigable waters other than
> traditionally navigable waters and adjacent wetlands if
> the program of the State meets the requirements set
> forth in the Conference substitute and is approved by
> the Environmental Protection Agency.  The Federal
> program for the regulation of the discharge of dredged
> or fill material into these waters is then suspended.
>
> The conferees wish to emphasize that such a State
> program is one which is established under State law and
> which functions in lieu of the Federal program.  It is
> not a delegation of Federal authority.  This is a point
> which has been widely misunderstood with regard to the
> permit program under section 402 of the Act . . . .
> That section, after which the Conference substitute

D.

Having determined that the CWA did not contemplate the same exclusivity of regulation as SMCRA, which therefore allows the enforcement of a federal cause of action regarding the discharge of pollutants to survive the suspension of the federal permit program, the next question is whether the plaintiffs' claim is brought pursuant to state or federal law.  The answer lies in part in the different nature of the claims in <u>Bragg</u> and the claim in this case.

The two counts in issue in <u>Bragg</u> alleged that the Secretary of the WVDEP engaged in a practice of approving mountaintop removal permits without making the appropriate findings and further that the necessary findings could not be

---

concerning State programs for the discharge of dredged or fill material is modeled, also provides for State programs which function in lieu of the Federal programs and does not involve a delegation of Federal authority.

(Defs.' Resp. to M.S.J. at 8-9, quoting H.R. Rep. No. 830, 95th Cong., 1st Sess. 104 (1977) (emphasis added by defendant).  While the House report's suggestion that the state permit program functions in lieu of the federal permit program is supported by the text of the statute, the suggestion that federal regulation of discharges of pollutants is suspended altogether is not supported by the text of the CWA.  <u>See</u> 33 U.S.C. 1342(c). Obviously, to the extent the report and the statute are not in sync, the statutory text controls.  <u>See</u> <u>Holder v. Hall</u>, 512 U.S. 874, 935 (THOMAS, J., concurring).

made accurately given the impossible requirements of the state regulation.  248 F.3d at 286-88.  The plaintiffs argued that the Secretary had violated his nondiscretionary duty under SMCRA in neglecting to make the requisite findings, and by failing to comply with applicable federal and state regulations.  Id. at 286-87.

Here, the characterization of the plaintiffs' only claim is vital.  Plaintiffs are suing the WVSP for its activities as a polluter, not as the entity issuing permits.  Their claim is brought under 33 U.S.C. § 1365 for violation of § 1311(a).  As found above, the WVDEP is a "person" under the CWA and therefore pursuant to § 1311(a) is prohibited from discharging pollutants without a permit.  Unlike in Bragg, § 1311 does not drop out when the federal permitting program is suspended in favor of the state's federally-approved program.  As a consequence, it does not matter in this instance whether the issuance of the permit is governed by state law or federal law.  The discharge of pollutants without a permit is the act the claim seeks to remedy, and it is governed by federal law.  The fact the remedy -- the permit -- is to be issued by the state is of little moment.  The plaintiffs are not suing the Secretary to force the WVDEP to issue a permit; instead, plaintiffs seek to have the WVDEP comply

with § 1311(a), a federal law, by obtaining a permit for its activities as a "person" discharging pollutants.  While the distinction may be subtle, it is nonetheless real.

The state, as an actor and operator of the bond forfeiture sites, is the polluter in this case; whereas, in Bragg, the state's misconduct was in terms of the state's failure to act in its regulatory role.  The state in Bragg was not the entity directly responsible for the harmful environmental effects and its misdeeds, if any, were governed exclusively by state law.[11]

_____

[11] Section 1342(c)(3) allows the EPA to withdraw approval of a state's permit program when the state is not following its federally-approved plan.  The procedures to be followed are explained as follows:

> Whenever the Administrator [EPA] determines after public hearing that a State is not administering a program approved under this section in accordance with requirements of this section, he shall so notify the State and, if appropriate corrective action is not taken within a reasonable time, not to exceed ninety days, the Administrator shall withdraw approval of such program.  The Administrator shall not withdraw approval of any such program unless he shall first have notified the State, and made public, in writing, the reasons for such withdrawal.

33 U.S.C. § 1342(c)(3).  The Secretary has not made the argument that the statutory design of the CWA would be frustrated by allowing this suit to go forward.  Assuming it had, while the court is sensitive to the delicate balance of cooperative federalism created by the CWA, such an argument would be

In sum, the exclusivity of regulation under SMCRA is similar to the CWA only with respect to the CWA's permitting regime.  Not all of the CWA provisions drop out or are suspended upon approval of a state permit program under the CWA.  The claim that the Secretary is discharging pollutants without a permit retains its federal character notwithstanding state regulation of the permit program.  See 33 U.S.C. §§ 1311(a), 1342.[12]  As such, the Ex parte Young exception to the Eleventh Amendment is applicable.  The Secretary is in violation of the CWA.  Accord West Virginia Highlands Conservancy, Inc. v. Huffman, 588 F. Supp. 2d at 692.

---

unavailing.  Section 1342(c)(3) provides for the withdrawal of a state's permitting authority when the EPA determines that the state is improperly administering its permit program.  The question is here is whether in its capacity as a polluter the WVDEP must obtain a permit; plaintiffs have not alleged that the WVDEP has neglected its duties as the administrator of the West Virginia NPDES permit program.  Thus, this case does not implicate the authority of the EPA under § 1342(c)(3).

[12] As noted in the parallel action filed in the Northern District of West Virginia, cases addressing the issue "have held that the Eleventh Amendment does not bar citizen suits under the CWA for prospective injunctive relief against state officials for violation of state-issued NPDES permits."  Huffman, 588 F. Supp. 2d at 686 (collecting examples).

VI.


It is accordingly ORDERED that plaintiffs' motion for summary judgment and declaratory and injunctive relief be, and it hereby is, granted.  The court DECLARES the Secretary to be in violation of the National Pollutant Discharge Elimination System permitting requirements of the Clean Water Act.  It is further ORDERED that the Secretary apply for, and obtain, NPDES permits for all sites at issue in this action.

The parties are directed to appear for a status conference to address the remaining issues in this case at 11:00 a.m. on September 4, 2009.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record.


DATED: August 24, 2009

John T. Copenhaver, Jr.
United States District Judge